We'll hear argument next in Case 11-460, Los Angeles Flood Control District v. the National Resources Defense Council. Mr. Coates. Mr. Chief Justice, and may it please the Court, in this case, the Ninth Circuit held that a discharge from a point source under the Clean Water Act occurred in the Los Angeles and San Gabriel Rivers based upon the fact that water moved from channelized portions of the Los Angeles and San Gabriel Rivers into what it termed as, quote, naturally occurring portions of those rivers. The Court emphasized, in fact, that the discharge occurred because it moved through the concrete portions. And in the words of the Court itself found at the surdependence at 44, it was, quote, again discharged to the rivers, and the again meaning that it was prior, at prior time, it was in the rivers. This is completely contrary to the Court's decision in Miccosukee Tribe, where the purposes of the NPDES permit program and the Clean Water Act based upon the mere transfer of water within a single body of water. All the parties to this case agree that is the correct rule. Virtually all the amici agree that is the correct rule. And it's our view that that is dispositive of this case. It is the only live issue before this Court from the Ninth Circuit that dictates it. Sotomayor So why don't we just remand and let it sort it out under the right understanding of the legal rule, which is basically what the government is saying, with an added twist because it thinks there's another legal question that I think the Ninth Circuit has answered, but we could go back and forth on that. Correct. At minimum, a reversal is warranted, without a doubt. But I think, given the record in this case, it is abundantly clear about what the claims were before the Ninth Circuit and what's going on with these monitoring stations. I mean, these monitoring stations are clearly within the rivers themselves. There's just no dispute about that. Even the Ninth Circuit's opinion, like I said, the language of the opinion suggests that it's not. Sotomayor Everybody agrees. Correct. And the reason why I don't think there's an open remand is because there's nothing further in the record really to argue about. At minimum, of course, we would prefer a reversal and it would take an open remand. But I think, given the record in this case, the only live claim before the Ninth Circuit was this discharge theory when they found it in the middle of rivers, and that being resolved against the Respondents, there's no other live issue. Roberts Well, it seems to me that they present a very direct syllogism. You have a permit that sets these monitoring stations where they are. The monitoring stations show exceedances. You have violated your permit. What's wrong with that? Well, because the nature of the monitoring here, for example, when you look at the permit in question, it doesn't say the monitoring of any permittee. If you look at the permit where it talks about the mass emissions monitoring stations, it talks about measuring discharges and compliance from the MS-4. Not any individual permittee's MS-4. Roberts Right. But I understand the argument to be that that's the problem that your permit imposes on you. In other words, that this is where the monitoring station is supposed to be. What is it monitoring, if not discharges, from the MS-4? For which you're responsible. The government suggests that there could be different rules about whether you have to show the allocation or if that's your responsibility. Well, I think, again, the rules say that you look at the permit's terms to interpret it. And the Ninth Circuit did look at the permit's terms. I mean, it dealt with this argument. And it noted that there are several factors in the permit that suggest that it didn't relieve the response of the obligation of having to show an actual discharge of water. Roberts But you don't question that there was an actual discharge. The storm sewer system in Los Angeles hasn't been shut down, right? Correct. So there are discharges, right? But not discharges of pollutants and that's important. You don't dispute that there was at least some small amount of pollutant, even below the permit level, from your point sources, do you? Well, we don't know that. But the point I'm making is that the point I'm making is that the point I'm making is that the point I'm making is that the point I'm making is that the point that  answer, and you'll have to do it on how much of a particular pollutant you can discharge. But again, you wouldn't do that unless you expected to discharge. Sometimes you might do it, others you might do it in concentrations that would cause or contribute to the exceedances. But you still have to have a discharge that causes or contributes to the exceedances. Well, why did you put the monitoring sources where they are if that wasn't what was going to measure your compliance with the permit? Because you're required in a system-wide permit like this to suggest, to propose monitoring which is subject to the approval of the regulatory agency, and it's a question of monitoring of what? Not monitoring of any individual permit he's discharged. In fact, it's not designed for that. We've even presented evidence in the district courts after that. But the government says that that question, you're saying I understand there are other dischargers, well, you're by far the dominant discharger, but I understand there are others and they may contribute as well to what the monitoring station says. But the government's position is that, well, that's how you wrote the permit without any allocation, and that whatever allocation issues you have may be between you and the other dischargers, but that doesn't affect the showing of liability. Well, except for the fact that the permit terms themselves say that each permittee is only responsible for its own discharge. If you read the permit in the general fashion that the Respondents wish, then you're not responsible only for your own discharge. It's essentially you're in immediately and responsible for all of them until you prove otherwise, and that's just not how the permit reads. Where is that? I know we've got the permit. Where does it read that way? Let's see. At the Joint Appendix, page 93, G4. What page again? Volume 1 of the Joint Appendix, page 93, and it's the fourth paragraph. And it's at the very bottom of the fourth paragraph. Each permittee is responsible only for a discharge for which it is the operator. Kennedy, I suppose that the district has 85 percent of the water by volume that's put into this river, and then you have this high pollution index. Does that make it an easier case for the challengers, or is that just irrelevant? It's just irrelevant unless you show that in that bulk of water there's a higher concentration of pollutants. You could have a major discharger that undertakes more vigorous pollution controls than a smaller discharge. It doesn't necessarily show you that you're adding more pollutants necessarily or how those pollutants contribute to exceedances measured at the mass emissions monitoring stations. Kennedy, I have one different question. This is hypothetical. It's not in the case. It's just for me to understand that. Suppose you have the river and part of it is a concrete bank and then there's a more natural bedding and then another concrete bank. And when the dry season they fix the concrete bank, but they use bad concrete and a lot of pollutants are coming out of the concrete, but it is in the river. Is that a discharge under this statute? I don't believe so, although I could imagine circumstances where you create an outfall unintentionally by funneling. I mean, I think you're talking about just natural erosion of turbidity or whatever into the river. I don't believe that would necessarily be a point source. It might be a nonpoint source pollution, but I don't believe that would necessarily be a point source if it's just inadvertently, you know, deteriorating into the river. Kennedy, that's a separate provision of the statute, nonpoint source pollutions? Well, it doesn't sound like, you know, the way it's defined under 1362 is, you know, an enclosed conveyance that discharges. Well, that's not in this case. Yeah, that's not in this case. But I think that that probably wouldn't be a discharge from a point source. Mr. Coates, I am still perplexed. You say, and it seems to be correct, that each alleged polluter is only a polluter who is only responsible for his own pollution, but you also say that these monitors are so situated that it is impossible to tell from the monitor who is responsible for the pollution. Is that right? I think that is right, because you look for the polluter. So whose fault is that? Well, the reason why, the reason why that that's there is to measure, essentially, the health of these rivers so that you can fine-tune the MS-4 permit, the system-wide permit, and so that you can gauge general water quality standards, and if necessary, you can fine-tune it to try and measure individual permittees. And we note that there is a renewed permit. It still has the monitoring stations in it. So under the Ninth Circus decision, we would still be discharging at those monitoring stations, but it does provide for outfall monitoring at representative outfalls for individual permittees to do precisely that kind of correlation that we are talking about. What is it that provides for that? There is a renewed permit. The permits are renewed every 5 years. This is, we are on the third permit now. This is the fourth. It's gone 10 years. The renewed permit continues the mass emission stations. So as I mentioned, we are still discharging in the middle of the river as far as the Ninth Circuit is concerned. But it does have provisions for additional monitoring near outfalls, along the banks of the rivers, for various permittees, so that in the future you can look at that testing and go, boy, your outfall is producing X, Y. Sotomayor So this was a regulatory void? This was a regulatory void that these – that there was no requirement previously that you monitor the outfall? Correct, that there be specific outfall monitoring. It's a regulatory void. Sotomayor So how do you envision this permit was – by the way, just one side question and then to this one. I thought the Ninth Circuit basically endorsed your view. That under the permit, you're not – you're only responsible for your own pollution. That is correct. Sotomayor So it's resolved this issue? It has resolved this issue. Sotomayor All right. So that's why I asked why remand and why you're saying why remand. But putting that aside, how do you think the system was supposed to work before? Do you have any obligation, once you soar the excess pollutants, to start the re-emission process, to try to figure out who was the cause of this? Well, if they attribute a violation to a particular permittee, for example, a district court noted, and the Ninth Circuit reemphasized it, you could at least, if you wanted to try and hook it to a single permittee, you could at least try and sample at an outfall for that permittee, and then provide evidence that that contributed to the exceedances. They didn't do that here in the lower jurisdiction. Sotomayor You mean the Respondents could have done that here? The Respondents could have done that here. They did not argue that they did that in the Ninth Circuit. They abandoned that in the Ninth Circuit. So what percentage of discharges come from you as opposed to the other members of the committee? We have the most infrastructure. I don't know the specific percentage, but bear in mind that there are 1,400 other entities upstairs. Give me an estimate. I can't in terms of total water volume. But we are the largest player in that portion of the system. I'm not going to downplay that. What I'm saying is that there's no necessary correlation between that and an ipso facto, you're the one causing the exceedances at the monitoring stations. That, again, there has to be something traceable to our discharge that contributes to those exceedances. What goes into these discharges besides the rainwater runoff? Here, it's just stormwater. I mean, a municipal separate storm sewer system. So your hypothesis is in some of these minority dischargers that for some reason their rainwater would have a different amount of pollutants than your rainwater. Well, they could very well have stormed, discharged different. Yes, there are other discharges upstream from the other. They are industrial sites that discharge water into the L.A. River. So, no, absolutely. Absolutely. And again, you know, the large jurisdiction, we may be more proactive in terms of doing pollution control as well. There's just no automatic correlation to that. And I think as the district court said, you know, it's not so much to ask to at least have a correlation so you can show exceedances at the moment. I'm sorry. I mean, you have to have a correlation. Kennedy was the Ninth Circuit's error here a factual one because it was based on the location of the stations, or was it a legal one because it misinterpreted our Muskogee case? It's a legal one. I don't believe it's a factual mistake for a couple of reasons. One, the language that I cited that's in the cert appendix at 44 where it talks about the water again discharged to the river, suggests that that water was in the river and now it's moving through our concrete channels and it's again discharged into the river. Its distinction that it draws is that there's something different because the MS-4 is an intrastate manmade construction as opposed to a naturally occurring river, which talks about the distinction being made in that regard. And finally, the record is just abundantly clear on where these monitoring stations are. The opinion itself at cert appendix page 18, footnote 4, cites our website as the location of the monitoring, for the location of the monitoring stations, and that website clearly says they're within the Los Angeles and San Gabriel rivers. And, in fact, appellant's brief, the Respondent's brief in the lower court, specifically said the same thing. Sotomayor, you sort of said there were polluters upstream. Are those industrial polluters upstream or industrial facilities? Are they within your MS-4? They are not. They have separate NPDES. Sotomayor, but what you're saying is that there are outfalls from different people into the same river. Correct. Correct. So we don't know whether the outfall is from your MS-4 or from some other source. Correct, because they're all upstream of the monitoring station. You say they have two remedies, that the NRDC, if they think you're polluting, could have done, could do two things. One, they could go and get some expert to try to get a sample or to make an estimate based on what he knows about the industrial sites, that it's actually your storm drains that are polluting. That's one thing they could do. You say they didn't do it. Okay. The second thing they could do is they could go to the permitting authority and they could say, will you please ask the L.A. County to monitor the actual storm drains when they come in, a sample thereof. And you're saying they could have done that, but they don't have to now because now that is a requirement and we're doing it. That's correct. Okay. That's correct. Where is that requirement? Excuse me? Where is that requirement that you're now doing? We, in our reply brief, we cite the fact that a renewed, the permit has just been renewed. We're waiting for the final version to go online and to see it. I think what we cite to the Court is the last one that was before the regional board. It lines out. So you're not doing it now? We're not doing it now. I mean, there's the new permit is technically effective. It could be stayed if someone challenges it. I think it's open until challenged until December 11th. But under the renewed permit, there's outfall monitoring, specific outfall monitoring. Now, the mass emission station is still there and under the Ninth Circuit's opinion, we're still discharging there and responsible for the exceedances. So, but that's the type of monitoring that plaintiffs want and that's in the new permit. If they want it in the last permit, they could have disputed it. They could have contested the last permit, but they didn't do so. This is a fine-tuning program. I mean, municipal stormwater is a complex issue. Congress didn't treat it the same way it did industrial stormwater. Is it your position that the rivers, the two rivers in question, are outside the MS-4? I thought there was a suggestion in the government brief that you could have both the river and the MS-4 that could cover the same area. We have, you know, in the lower courts, the district personnel refer to the channelized portion as part of our MS-4 because it's all flood control to us. However, we've never said it's all the same for purposes of a discharge. We've been very careful about that, that for a discharge from a point source, an outfall, not the monitoring stations. In fact, in the district court, plaintiffs somewhat argued that theory, the monitoring stations are in your MS-4, there are exceedances, ergo exceedances in your MS-4. And we pointed out under Mikosuke, there's no discharge of water. There's no discharge because it's merely transferring water as water moves past the monitoring stations. And that's the purpose of having the monitoring station if nothing can be done. And the monitoring shows, yes, there's a lot of pollutants in there, and we know that at least some of them have to be ascribed to the district. But you say unless you show the outflow that comes from there, no liability. Why shouldn't it be that given there's going to be a contribution that the district is making, that the district should have the burden of showing, no, there are all these other ones out there, so our percentage is X, not the whole thing? Well, again, the Water Act makes you responsible for a discharge in violation of permit terms. So you have to have a discharge by the permittee. The permit terms itself are not written in that fashion. Again, it says we are only responsible for our own discharge. Could you write a permit that way?  But this permit was not written that way. And, in fact, the Ninth Circuit agreed with us on that. The permit language is not tricky on that. You could have permittee monitoring. You could. And that's what the renewed permit does. But that is not this permit. The Regional Board, as I said, it's part of a process. There have been three permits over the last — since 1990. And we have a fourth permit, and it has some new provisions to fine-tune it for precisely this reason. I note that, as I said, the biggest district we seem to have on this monitoring issue, and it's one that I think the discussion we are having bears out, is that it is not a straightforward issue, that when you look at the statute itself, the statute 1342p3 distinguishes between industrial stormwater dischargers and municipal stormwater dischargers. And I think it is worth looking at that provision, because if you look at A, and that talks about industrial dischargers, it says they have to meet every requirement of this provision. And if you go to 1342a, it includes everything, including the monitoring requirements of 33 U.S.C. 1318. But if you look at 1342p3, subdivision B, which talks about municipal stormwater, you do not see that language. You do not see that must comply with every other provision of this section. It doesn't say that. It only has essentially three requirements, which is these permits can be granted on a system-wide or jurisdiction-wide basis. You have to only allow stormwater, and that the must provide to try and manage pollutants to the maximum extent practicable, and that's some total of it. So I don't think you can assume that these are identical monitoring requirements. It's at the very least a complex question. I think it's one that would have behooved the Court to be able to obtain more amicus assistance on. And part of it is the way that this was raised to this Court, that this was a proper issue for a cross petition. And the only justification I've seen for this is I saw a letter come to the Court advising it of two cases. I think LeToulet v. Schofield, I don't know if it's LeToulet or LeToul, and Ryerson v. United States. And neither one of those suggests that this is an appropriate issue for the Court. Scalia. Is your description of the statute meant to conclude, or does it, does it conclude that these outsource monitoring stations which exist under the new permit are not really required? Well, they're not necessarily statutorily required, but they are part of the permit. Yes. They're in there. They're in there. We're not. We've agreed. We've agreed. Can you put in the permit stuff that the statute does not require? Well, I think you can agree to terms in a permit, yes. Okay. Yeah. And with that, I would reserve the balance of my time for rebuttal. Thank you, counsel. Mr. Shah. Mr. Chief Justice, and may it please the Court. The answer to the question presented in this case is both straightforward and undisputed. Under this Court's decision in Mikosuke, no addition and thus no discharge of Pluton occurs. When water flows from a channelized portion of a river to a downstream portion of that same river. Because the monitoring stations at issue are actually located within the rivers themselves, the court of appeals erred in concluding that a discharge of Pluton occurred when, quote, the still polluted stormwater flowed out of the concrete channels where the monitoring stations are located, through and outfall and into the navigable waterways. And because the court of appeals rested its liability determination on that erroneous premise, the judgment should be vacated and the case remanded to the court of appeals. Ginsburg. Mr. Shah, what about the problem that one of the amici brought up concerning dredged material, said that if we just say Mikosuke applies, then when there's a dredging operation and the material is redeposited back into the same water, then that would also be, there would be no responsibility based on that. Shah, Your Honor, I think the one amicus that does raise that issue raises a limited to, the biggest counterexample they raise is the one that you raise about section 404 permits for dredged and fill material. Those permits are just very different in kind. Section 404 applies to dredged and fill material, which almost by definition is going to be coming from the source itself. And so we think that the Mikosuke line of decision just doesn't apply to that permitting regime, which is a very different sort of permitting regime than we have at issue here. And in any event, I think it's far beyond the question presented in this case, the Mikosuke rule. Sotomayor, I thought, and correct me in whatever step I'm wrong, okay, that the district court rejected Respondent's argument that the mere monitoring excesses created liability. What it said is, you have to follow the terms of the permit and make the permittee responsible only for their excess discharges, and you haven't shown us any evidence that does that. The Ninth Circuit agreed that the permittee is only liable for its own discharges. It held the permittee liable because it believed that the discharges were within their source, within their outflow. So what are we remanding for? The legal question of whether the monitoring stations automatically create liability has been answered in the negative by both courts. Shahrer, I agree with your reading of both opinions below. I think what we're asking for is a court to do what it normally does when it vacates an erroneous part of a judgment and sends it back. That is, leave it open to the court of appeals to address any issues consistent with this Court's opinion. We think it's conceivable that the Ninth Circuit might approach the permit construction issue differently once it's corrected of the misimpressions that it had before. Sotomayor, what could it do differently? I think in particular, the Ninth Circuit construed this permit on the understanding that there was a discharge of polluted water after it flowed past the monitoring station, and so that the district could be liable based simply on the exceedance measured by the mass emission station below. Sotomayor, how did that change the answer to the legal question, that the permittee – both courts have said the permittee is only liable for their own discharges, and unless this proves that they discharged, they themselves discharged, which it can't because it's in the river and not within the source, how can that alone establish liability? Well, again, I think the Ninth Circuit predicated its permit interpretation on the understanding that there would be at least some way to hold a permittee, in this case the district liable, based on the mass emission exceedance alone, and that's because it misapprehended that there would be a discharge of flow of the polluted water. It could be, and it may not be, we don't know until it gets back to the Ninth Circuit, it may be that the Ninth Circuit would reject the view that you could have a permit that sets up a permitting regime that does not allow a plaintiff to sue any particular permittee, unless it has evidence beyond that provided by the Constitution. So what follows from that? That the district is liable because it's a lousy permit? Well, Your Honor, if the Ninth Circuit doesn't have a permittee, then it's not liable. I do not see how this Court, how the court of appeals is going to be able to do anything different other than say there's no liability here, unless, of course, it adopts another fanciful interpretation of the statute. Which is something I worry about. Well, Your Honor, we think that this permit, again, the terms of this permit are both complex and ambiguous. We do not think that permits should be written this way. We think permits that provide for water quality, for MS4s to adhere to water quality standards based on ambient monitoring should be coupled with either individual I agree with that, but how can this permit possibly be interpreted in such a way as to hold the district liable? Well, I think the most persuasive, and again, we don't take a firm position on this, but I think the most persuasive argument on the other side would be that when permit writers issue a permit, they assume that the permitting regime provided in the permit would provide a basis to seek enforcement of that permit. So that would be true. They may well assume that, but if it doesn't, it doesn't. So what do you do if it doesn't? Well, one could imagine a regime where the permittees, that is, the municipalities who apply for a joint permit, would agree to a shared presumption of liability. For example, if they're district liable. They have not agreed. Well, again, we don't. You're going to impose a shared thing? I see no way for the court of appeals to do this in a fashion that will not bring the case right back here, and you'll be asking us to send it back to the same panel. Well, Your Honor, I don't think it's a cert-worthy issue how to interpret the terms of this specific permit. But anyway, they say that the court held the same thing in two other cases involving two other rivers, and they didn't cross-appeal from that, and so that issue isn't really in front of us. Well, Your Honor. And if they did hold what you said, then they'd have to reopen the other two cases. Right. Your Honor, I think in terms of the cross-petition issue, that is a close question. I don't think the court needs to get near it, because I think there are several  of the issue itself. If we decide that they needed to file a cross-petition and they didn't, then what's the basis for our remanding rather than reversing it? It's that issue we have to decide. Your Honor, it's established that this Court, even if a cross-petition were required, it's established that this Court has the authority to remand for disposition of any further issues once a case comes before this Court. So the cross-petition Why should we, in light of the clarity of the permit? That's the question Justice Scalia is asking. Sure. I think the Court should just follow its ordinary practice. We're not asking for anything different than its ordinary practice of vacating the judgment and remanding for further proceedings consistent with its opinion. That is not our ordinary practice, when nothing can happen on remand except to give judgment for the petitioner. Well, I think it would be unusual for the Court to reverse and then instruct that judgment be entered in favor of Petitioner. Of course, the Court is free to do that, and it may decide to do that. We just think that there is a possibility that the Ninth Circuit would take a different approach. Sometimes the Court says the bottom line in that italicized thing, which I've never fully understood when and when we don't do it, but it just says reversed. Right. And then sometimes it says it is so ordered. And exactly when you write the word reversed, what I usually do is I ask the clerk cards. But the question is when do we do the one and the other, and I think here what they're saying is just write the word reversed. We'll deal with the rest of it. So that's right. And again, the Court is well within its discretion to do that. We think it's better to do that. Sotomayor, doesn't that always say that in the judgment of the Court? Doesn't it always say what? Does it say it is so ordered in the judgment that we release? Yes, yes. And I think the typical phrasing would be vacate and remand for further proceedings. Mr. Shaw, am I right about that this other theory, if it were open to the Ninth Circuit, would apply equally to the other rivers that Justice Breyer mentioned? And those were out of the case, because when it got to the Ninth Circuit, we were talking about only the Los Angeles and the San Gabriel. That's right, Your Honor. But that other theory would apply to all four. I think that is correct, and the Ninth Circuit may decide that therefore it's not going to revisit its permit interpretation. I think it might be within the Ninth Circuit's discretion, since it still has the case on remand, if it were to revisit its permit construction. The reason it would not look at Malibu and what's the other one that we're already going to close? The other watershed. Yeah. Would be because it wouldn't comply with the cross-petition rule. No, no. We're not going to send it back to them. No. I'm sorry. I thought it would be that the rationale that they used for those two rivers, it would be in tension with it. And if they agree that the rationale which led them to deny it, to deny liability on those two rivers, that may lead them to adhere to its current permit interpretation. Do you have a position on the cross-petition issue? No, Your Honor, we do not. Thank you, counsel. Thank you. Mr. Colangelo. Mr. Chief Justice, and may it please the Court, we do not defend the judgment on the Ninth Circuit's stated rationale, but on alternative grounds that are properly before this Court. The compliance monitoring included in the permit determines Petitioner's liability for permit violations as a matter of law, as the Clean Water Act, EPA regulations, and the permit's own terms all require. Well, where is the permit's own terms? Your friend cited JA93, which says each permittee is responsible only for a discharge for which it is the operator. So where does the permit clearly show the opposite? Your Honor, let me point you to three provisions in the permit that, taken together, compel this result. The first is page 195 of the Joint Appendix, the paragraph numbered D1. And this refers to the individual permittees, and it says, Each permittee must comply with all of the terms, requirements, and conditions of this order. Any violation of this order constitutes a violation of the Clean Water Act, its regulations, and the California Water Code, and is grounds for enforcement action. And that's the first of the three provisions. And it is undisputed here that there are permit violations. The monitoring included in the permit that Petitioner and its co-permittees chose have demonstrated since 2003 undisputed permit violations. The second provision is page 98. Scalia. But before you go further, it says each permittee must comply. It doesn't say that each permittee shall be responsible or shall be liable. And it's the other provision that says that. Each permittee is responsible only for a discharge for which it is the operator. So you've got more? Yes, Your Honor. More besides 195. Well, and what 195 adds is it says any violation is grounds for enforcement action. Now, JA 98 talks about exactly this circumstance. When violations are detected at the monitoring stations. And about halfway down JA 98, it says, If exceedances of water quality objectives or water quality standards persist and that's only measured in one place, that's at the compliance monitoring in the rivers, notwithstanding implementation of control measures and other requirements of this permit, quote, The permittee, individually, the permittee shall assure compliance with discharge prohibitions and receiving water limitations by complying with the following procedure. It then sets out four steps that each permittee must comply with to bring the MS-4 within the permit limits. Now, that is Of course, the very first step is, A, upon a determination by either the permittee or the regional board that discharges are causing or contributing to an exceedance of an applicable water quality standard, the permittee shall promptly notify, et cetera. They cannot make such a determination because of the nature of the monitoring here. That's incorrect, Your Honor. The permit compels this result because there is only one place in the permit that that monitoring is required, and that is the in-stream mass emission stations that the permittees chose. And the permit says explicitly the monitoring results at those locations are used to assess compliance and determine whether the MS-4 is contributing to violation. Breyer, But as I read it, and he explained it, I thought that, look, what they're thinking is this. Stormwater is really a big problem and it's really complicated how you work it out. And we want the agencies to work it out. So the purpose of this monitoring thing is we first determine that there is an exceedance. Now, once we determine that there is an exceedance, which is the point of this permit particular requirement, then we're going to go on to decide who. And what we're going to do is leave you with two possible choices. One is you can try to figure out who, which means you've got to get an expert and monitor it, or let us now have a new permit which will, will, you know, which will put some responsibility on the individuals because we'll monitor higher up the river. Now, that's a rational way for an agency to proceed, and it leaves you with pretty good remedies. And so why are we running all around trying to work this thing out? Why don't you just sort of try to deal with it as they described it and say, okay, we're going to either prove you did it before or at least we can prove it now. There are two answers to that, Your Honor. The first is this is all sorted out during the permitting process. This permit was adopted by the State agency and upheld by State courts upon Petitioner's challenge after 5 years of litigation. The permit was based on an 80,000-page administrative record and testimony of 29 witnesses. And the point of this process is that permit terms are fixed once the permit is finalized and approved by the courts. Now, the reason we didn't challenge the permit at the time is that we were defending the permit alongside the State agency as an intervener against Petitioner's challenge. Petitioner, in State court for years, made exactly the opposite argument that it makes here. It said that it was entitled to a safe harbor provision in the permit to excuse it from liability because it would be held responsible based on this in-stream monitoring. Now, there may be, as a technical or scientific matter, better monitoring programs to determine who's putting in what and where exactly it is coming from, but that cannot be reopened upon an enforcement proceeding. Ginsburg. But how do you — the district is a big contributor, but there are other contributors. So on your theory, how do we determine what is the share that the district would be liable for? Your Honor, the permit includes a blueprint that sorts that out, and it parallels the traditional notion of several liability, where there are multiple contributors to a single harm, each is responsible for its share. But you still have to show that there's a contributor. I've been through these sections, and it seems to me that a reasonable interpretation of this section is that there's a violation if a particular permittee violates. And what I'm taking away from your argument is that once there's a violation, all the permittees are liable, and that just can't be. It can be, Your Honor, and that's the solution that the permit works out and that the permittees negotiated for in advance. What's the third section, Mr. Kline? I'm waiting breathlessly for your third section. You said there were three. The third, Your Honor. I've got 195, I've got 98, where's the third one? The third, Your Honor, is JA-109. 109. And this parallels a provision in EPA's regulations. At the very bottom of JA-109, subsection D, it says, the permittees shall carry out all inspection, surveillance, and monitoring procedures necessary to determine compliance and noncompliance with permit conditions. So the problem with Petitioner's theory is that they are violating this provision of the permit, which is taken virtually verbatim from EPA regulations, which says that the discharger has the responsibility to measure and report its own violations. And stepping back to talk about the Clean Water Act program generally and the discharge permit program generally, no one is entitled to discharge without a permit. A permit fixes terms that must be complied with, and at the heart of the permitting program is self-monitoring and self-reporting of violations. Roberts. Well, the D, looking at 109, it strikes me as a little bit circular to say they have the responsibility to carry out inspection and surveillance and monitoring to ensure compliance with the permit, and their point is, well, we're not — we're not — we're not not in compliance with the permit because you haven't — there hasn't been an allocation of the discharges to them. Well, and the problem with that, Your Honor, is that it leads to no liability ever for the discharger, even though it would seem to. Well, I think that might be — I think that might be right, but that gets back to the question of whether the permit is — is poorly drafted. Right. And I guess the idea is they're changing the permit, so — to cure that problem. The permit has changed. It is not yet effective, Your Honor, but there is a new permit that will be in effect  But on the question of whether the permit is in effect, I think that's a good point. Why do you need that, if the present permit covers it as clearly as you say? I mean, self-monitoring. That is absolutely— My goodness, you're going to go through all of this? How many — how long did it take you to challenge this, and blah, blah, blah, blah? Why go through all that if, indeed, the present permit, as you say, is perfectly adequate? The present permit is adequate. The State agency renewed the permit. That's a matter of course. It changed the monitoring program. The point is that whatever monitoring the State agency sets and that the State courts uphold is the monitoring that determines compliance. Well, would you still — I'm not clear, if you gave me an answer, to how the district share would be determined. It is not the only polluter. Are you saying each permittee is responsible for the whole? No, Your Honor. That's joint and several liability. And here, JA 93, which Petitioner cites, says that each permittee is responsible only for its discharges. That's just— How do we find out what is its share? The permit sets that out. The permit says once a violation is detected, each permittee has to go back upstream, conduct enhanced monitoring to identify the particular sources of pollution within its jurisdiction, control those sources, but only those within its jurisdiction, and continue that process until the problem is resolved. Is that the 109 language you're citing? No, Your Honor. That's at both 98, which I cited second, and page 213. Okay. So the upshot would be, however, as I understand it, and correct me if I'm wrong, that since they're doing that now anyway under the new permit, then you can question my hypothetical assumption there, but if they are doing it under the new permit, then the only result of your winning this would be to transfer the running of the district from the agency to the court, and I suspect the Ninth Circuit knows less about it than you participating in some kind of negotiation with the agency. No, not at all, Your Honor. The Petitioner retains the authority and, indeed, the responsibility to identify the particular sources within its jurisdiction that are causing the problem and abating only those. So it is limited in response to Justice Ginsburg's earlier question only to its own share. There is no question that there are other contributors, but the permit doesn't impose a violation only upon the entity who is the sole cause. There are many polluters that discharge into these rivers. The permit specifically says it is unlawful to cause or contribute to a violation of water quality standards. So prohibiting a contribution assumes that there will be other contributors and that the Petitioner will not be the sole cause. Roberts. Well, this is all fine and good. Your friend, though, says you should have crossed petition because the relief you seek expands the judgment below and there are all these cases saying you can't do that. Your Honor, the relief we seek would not expand the judgment below because the two rivers on which we lost are out of the case. Well, I would have — I understand that, and it seems reasonable, but they do cite a lot of cases that say you can't do that. You can't just sort of say, oh, I give up on the others, because the judgment, I guess, is one whole and you would be changing the judgment. Accepting this argument, Your Honor, would not change the judgment. The cases that Petitioner cites are all examples in — except for one, which I'll get to in a second, where the Respondent was seeking to change the judgment, either in its favor or to get lesser relief, or where the result would necessarily have changed the judgment. Here, accepting this argument would not change the judgment. Why would it necessarily? Because you're giving up on the two rivers, even though your theory would work the same way with respect to them. That's correct, Your Honor, and that's consistent with the cross-petition rule. A Respondent who is satisfied with the result below and does not seek to change the judgment does not need to cross-petition. A cross-petition is only necessary if the result is not changed. Ginsburg. The trial court was wrong, the district court was wrong, and the Ninth Circuit both times when they said, well, you didn't prove — there was no proof that the district was responsible for a given part. So on your theory, both the district court and the Ninth Circuit were wrong on that. On that legal question, Your Honor, yes, but this Court can affirm on any basis preserved below, and this was also preserved in our brief in opposition at the jurisdictional stage, as long as it would not change the judgment. And here's why it would not. Let me distinguish the Northwest Airlines v. County of Kent case, which Petitioner cites. That case presents, in fact, the opposite situation of what we have here. In that case, Respondent's argument, had it been accepted, would have required the district court to grant further relief in continuing proceedings on a claim that no longer existed, because the Respondent's argument was that there was no private right of action at all. Our case is the opposite, because if the Court accepts our position, we simply don't get any further relief with respect to claims that are waived, to which we would have been entitled. And the two cases that we cited by letter last week both represent exactly that situation. Scalia. Mr. Colangelo, did you raise this argument in your brief in opposition? Yes, Your Honor, we did. Where is it in that? I'm looking for it. It's in two places in the brief in opposition, page 4 to 5, where we set out this compliance monitoring framework, and page 18 to 19. But that may be, but you don't support the – and page what? Page 18 to 19. And then again in our supplemental brief, Your Honor. Here, but you don't? At the search stage. You don't say that that's the basis for supporting the decision below. I certainly didn't. We do. Let me just quote what may be the most explicit thing, Your Honor, which is at the very bottom of page 4 in our supplemental brief at the search stage. The court of appeals ruling was both correct and equitable. Every Clean Water Act permit must include monitoring provisions ensuring that permit conditions are satisfied. And we lay out the compliance monitoring. That's 4 to 5 of our supplemental brief in opposition to cert. I don't have your supplemental brief in front of me. We're on 4 to 5? At the very bottom of page 4, the last two lines, and the top of page 5. Final – now, most of our supplemental brief and our brief in opposition were addressing why we did not think Petitioner's question merited this Court's review. This is the argument that we made in defense of the judgment below. The court of appeals ruling was both correct and equitable. Every permit must include sufficient monitoring to determine compliance. Scalia. Well, but that's just to say you can rely on the extant monitors. Absolutely, Your Honor. So you say, you know, they were correct. You have to find some basis for liability, and they used the monitors and that's it. It didn't. It didn't say in detail that these people had to go and set up their own monitoring under the permit. Your Honor, that was the – that was our argument in the Ninth Circuit and at the search state, and that we do lay out exactly how the permit works. The point is that the permit imposes liability on the multiple discharges. You told this to the Ninth Circuit, and the Ninth Circuit said no. That's correct, Your Honor. That's correct. But we can – we can defend the judgment on the basis even one that the Ninth Circuit rejected. To go back to the Court of Appeals ruling, we have a different argument. Suppose we did what the Solicitor General says to do and vacated this. Can you think of any reason why the Ninth Circuit would change its mind? I mean, is there any connection between these two issues that you can point to such that are making clear to the Ninth Circuit that they made a mistake on one actually would affect their analysis on the other? There is one reason, Your Honor, and that is that a permit is interpreted like a contract, and it is a cardinal rule of contract interpretation that a contract should be read where possible to be both lawful and enforceable. So the Ninth Circuit may go back down and say, okay, with this corrected understanding of the universe of law and facts that apply, we see that Petitioner's reading of the permit would render it unenforceable because none of the permittees can be held liable, and therefore unlawful, because the Clean Water Act requires all permits to include within it self-monitoring and self-reporting to demonstrate a violation. So the Ninth Circuit now, it may just say, we say what we said before, but it could reconsider on that basis, and that would be a legitimate basis for it to do so. To go back to the earlier question about where there is a discharge, there is no question that Petitioner discharges these pollutants to these rivers. So the only question for this enforcement proceeding is where to measure Petitioner's discharges for purposes of liability. Kennedy, where do I look to find out that the district is making a discharge of polluted water other than under the Ninth Circuit's theory that it's in the river itself? Two places, Your Honor. First is that it's a premise for the permit itself. So if you look at page JA55, it says the Petitioner discharges stormwater into these rivers, and then the very next paragraph shows that the Petitioner has done an assessment of the pollutants that are typically in its discharges, and it lists the ones that are now in violation here. So the permit, it didn't — it came out of this administrative process, and one of the elements of this process is that if the district is permitted to, on a scale of 1 to 10, to discharge up to 2, but that if the monitoring station in the river shows an 8, then it is automatically liable for the increase, even though other discharges might have made this? Yes. Yes, because — I don't get that from what you have read. I've looked at the text you've read, and it looks to me like it's permittee by permittee. It says that the MS-4 is in violation, that's correct, but then it says each permittee must, when an exceedance is detected, take these steps. So here, what they have failed to do is take the necessary steps to apportion responsibility among the multiple contributors. The second place, just to finish on the proof that they discharged. No, no, no, finish that. So what's the consequence of that? I'm sorry, what's that? Therefore, each one of them is liable for all of it? No, no, Your Honor, no. Each one is liable for what they put in and bears the burden to demonstrate and limit what it puts in. That's explicit in the permit. But they haven't done so. So what? So that's a permit violation. And the result is that this pollution continues year after year after year, when the point of the permit and the point of the Clean Water Act was to eliminate what everybody agrees is the biggest source of water pollution in Southern California. And this is a circle out of it. So if each permittee is allowed to put in a 2, but one permittee puts in an 8, then both permittees are liable? Correct, Your Honor, unless. Because those facts are not known at the time the violation is being done. No, no, we now know the facts, because it's the hypothetical. Okay. So if the permittee has done its own monitoring, in addition to what the permit requires and can demonstrate that it did not put anything in, then it is not liable. If not, then yes, two dischargers into the same river who agree in advance to be measured by a single monitoring station in the river are liable for what's measured there, and then they sort it out. And Congress set up a regime that would allow for system-wide and jurisdiction-wide permits precisely because this problem was so complicated. Are the provisions we've been talking about, the three that you cited and the one that you've written, are they boilerplate? Do they show up in every typical stormwater permit? Well, 109, the fact that the permittees must conduct all monitoring to demonstrate compliance, if boilerplate means they're in all permits, then yes, because that's a requirement of EPA regulations. What about the one that says each permittee is responsible only for a discharge for which it is the opposite? That's from an EPA regulation, too, yes. That's in the definition of co-permittee at 122.2. So yes, that's also standard in system-wide permits. To go back to the earlier question about where there is a discharge, the district court found, and this is undisputed, at Petition Appendix 117, the permit admits the permittee, Petitioner, admits that it is discharging these pollutants, the ones measured in violation, to these rivers. So what we have is no question, no dispute that they discharged these pollutants, a monitoring system included in the permit that the State court upheld against Petitioner's challenge, showing that those limits have been exceeded. Your basic argument is this permit requires ULA County to do monitoring to decide if you're violating it. You chose this system, and common sense suggests you're doing it. You struck out twice with that argument in the other two rivers, and now you're going to go back, if we permit it, and we want to make the argument and tell the Ninth Circuit three times and you're out. In this case, hold the opposite. That's what you want to do. I'm not sure I would say we struck out, Your Honor, the EPA. I understand that. But correct. The lower court did not, neither lower court accepted this argument fully. The Ninth Circuit did agree that all permits must include compliance monitoring, but it said you need a little more here. And we think that was improper because you can't add terms to the permit once it's been settled. And there was an earlier question, Justice Breyer, about could we sample from an individual outfall, could we show more. The problem with that is that it would prove nothing. The Petitioner has said just sample from one outfall, one of our outfalls. We alleged 140 violations for a dozen different pollutants over a 5-year period. So sampling from a single outfall as an evidentiary matter would be utterly meaningless. Couldn't you get some expert who understood? Well, we did, Your Honor, in district court, as an alternative theory, have an expert who said all of this came from them. The district court did not address that, and we didn't appeal. The appeal was limited just to this legal issue. I don't understand why you didn't cross-appeal on this theory that the lower court rejected. Because, Your Honor, we were satisfied with the judgment, and that's the rule. A Respondent who is satisfied does not need to cross-appeal unless it is stated in the statute. I didn't say you need to. I didn't say you needed to. But I would normally have done it, just to be sure I had that arrow in my quiver, and that it would not be argued, as it will be here, that this would be expanding the judgment below. And the reason it would not be expanding the judgment below is that we are on the opposite side of what happened in Kent. To rule in our favor on this argument would just leave untouched two claims on which we didn't prevail. We get no further relief on those. It's like two coplaintiffs in district court who both lose identical claims. One appeals and the other doesn't. The one who appeals wins a reversal. That creates an inconsistency. Two similarly situated plaintiffs, one has a valid claim, one no longer does. But that's the consequence of our failing to cross-petition. Sotomayor, I just don't remember now. Do we have a circuit split on this issue of whether a permit in a situation like this would impose liability on all permittees? No. No, there is no circuit. I don't know of any other circuit court who has addressed this question. And let me speak to the issue of additional monitoring, putting the burden on plaintiffs to conduct additional monitoring. The problem is it creates a complicated factual dispute for district courts to resolve when that was exactly what Congress wanted to eliminate. When Congress adopted this permit program in the Clean Water Act and then amended it to bring municipal stormwater discharges under the program, Congress said, we do not want district courts to be the forum for sorting out all of these complicated factual issues. I see it. What do you think of the government's point? They're telling us, just write what you usually write, and then you can go make all your arguments, we'll see what they do, or does that satisfy you? Your Honor, we'd be most satisfied with an affirmance on the ground we've presented. If the Court vacates, we'd be satisfied with that, too, and we would go back to the district. And then the Court of Appeals would say, well, if this panel found for you on the ground that they used, they'll surely find for you on this other ground. Which has at least an inkling of plausibility. Thank you, Your Honor. Thank you, counsel. Mr. Coates, you have 4 minutes remaining. Thank you, Your Honor. To the cross-appeal issue, the cases that we cite talk about the court's prudential limitation on deciding questions that are not preserved by cross-petition. And I depart from my learned opponent, Mr. Colangelo, on that point as to what the case is that we cite, the Northwest Airlines v. County of Kent case. And that is a case where, in fact, the Respondent was not seeking to change the judgment below. They did not cross-petition. They were just trying to keep what they had. And the Court said, we're not going to reach that issue, because if we buy the fact that there is, in fact, no private right of action, the effect of that is to essentially change the underlying judgment. Let me ask a quick question. Sure. Does it satisfy you if we just write in the judgment what you usually write, and then you all can argue what it means below? What about that? Does that satisfy you? Or do you want us to write something special? It's acceptable because a reversal is always better than an affirmance. But talking about what the Court decides and what's left in the case, I think it is a case where the Court reviews what the Ninth Circuit actually decided, what is actually before it, and what is properly remaining in the case, because we don't believe the cross-appeal issue is here. And that leads, I think, to reversing the Ninth Circuit because the district is entitled to summary judgment on these two River claims. And I think that is all that's left in the case. And I call the Court's attention to another case we cited on the cross-appeal issue. It's one of the NLRB cases, the express publication case. And it makes it very clear there that the Respondent was just trying to hang on so long as he could to what was good about the order as he could keep and was not seeking to change anything. And again, the Court said no. It basically undermines the entire basis of the district. Scalia. And did we use our usual language and did it go back and the Court of Appeals considered the issue we had refused to consider? One of the cases the Court simply affirmed and so it didn't go anywhere. Okay. But don't we have two different – I don't know that we do this all the time. When we expect them to keep the case and do something different, don't we usually vacate and remand rather than reverse? Well, I do know that in the context of a lot of the Court's opinions, the Court will specify that judgment be granted in terms of a party. I know the qualified immunity case is you find someone is entitled to qualified immunity and it comes up on a summary judgment. The reversal is to the Ninth Circuit. And I've seen both languages used, but it's plain from the text of the opinion that judgment is to be entered in favor of that party. And again, I think that's appropriate here. My opponent suggests and the government suggests again that let's go back to the Ninth Circuit and let them consider this monitoring argument. They considered it. In fact, they even considered the use of contract terms that they urged them to consider again. It's already rejected that claim with respect to these two rivers that are in front of the Court. It's rejected it with respect to Malibu Creek and Santa Clara River, which is not in front of the Court. They even accepted it with respect to an entire different party that's on the Court. Scalia, they might change their mind now. They might change their mind. It would be a very odd judgment because you'd have two claims that are going to be dismissed that are not properly before any court. Those are closed. And you have another party out of the case on the very ground that the Ninth Circuit rejected in the initial opinion. So to remand for some consideration of an issue that's already spoken on just doesn't seem to make sense and invites the very sort of kind of jurisdictional confusion that I think leads the Court, for prudential reasons, not to consider these things unless there's a cross-petition. I think that's why this is kind of the great example of why prudential reasons say you're not. Roberts, I mean, you do cite a lot of cases for that, but I can't figure out what sense it makes. I mean, if you're willing to give up Santa Clara and Malibu, you're safe there and that's the only thing you won. Why does it – how does that make sense? Well, the Court does it for two reasons. It does it as a prudential matter because it does look odd to affirm on – to make a decision in this Court on a ground that essentially repudiates the lower court decision. It does it for prudential reasons. And in fact, the case they cite, Le Tollet, which basically says the Court has the jurisdiction to do that when someone abandons the piecemeal claim, is cited only once in this context after that, and that's in the United States v. ITT, Continental Baking Case, 420 U.S. 223 footnote 2, and the Court gives it a but-see for the proposition that you have the jurisdiction to do it, but then describes this exact situation and says for prudential reasons we don't do it because it undermines our cert jurisdiction, particularly if resolution of that issue is highly fact-specific, the one they're trying to bring up, and it would really foreclose having to even decide the cert issue because you wouldn't get to it. Thank you, counsel. The case is submitted.